Aaron H. Marks (amarks@kasowitz.com)
Gavin D. Schryver (gschryver@kasowitz.com)
A. Macdonald Caputo (acaputo@kasowitz.com)

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.:    (212) 506-1700
Fax:    (212) 506-1800

*Attorneys for Plaintiffs*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

EMMET & CO., INC. and
FIRST MANHATTAN CO.,

     Plaintiffs,

    v.

CATHOLIC HEALTH EAST and
MERRILL LYNCH & CO., INC.,

     Defendants.

--------------------------------------------------------------X

No. 11-Civ.-3272 (RMB)

**Jury Trial Demanded**

# FIRST AMENDED COMPLAINT

Plaintiffs Emmet & Co., Inc. ("Emmet & Co.") and First Manhattan Co., on behalf of certain of its clients ("FMC," and together with Emmet & Co., "Plaintiffs"), by their undersigned attorneys, Kasowitz, Benson, Torres & Friedman LLP, as and for their First Amended Complaint against defendants Catholic Health East ("CHE") and Merrill Lynch & Co., Inc. ("Merrill Lynch," and together, "Defendants"), hereby allege, upon knowledge as to themselves and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.     This action involves the deliberate bad faith and predatory conduct of defendant CHE, a multi-state health care system, with regard to certain tax-exempt municipal bonds (the "Bonds") issued for the benefit of various hospitals in which CHE has an interest, which, until May 18, 2011, were owned by Plaintiff Emmet & Co., and the clients of Plaintiff FMC. Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch"), the underwriter for certain of the Bonds and financial advisor to CHE, has played a central role in the improper conduct at issue at here.

2.     Because the Bonds were trading for higher than face value (*i.e.*, the Bonds bore a relatively high interest rate), Defendants hatched a scheme to improperly redeem a portion of the Bonds and capture for themselves the spread between the price at which the Bonds were trading and their face value -- to the detriment of CHE's Bondholders, including Plaintiffs. Defendants' scheme, however, patently violated the Indentures governing the Bonds (the "Indentures").

3.     Central to the scheme, CHE, aided by Merrill Lynch, issued tender offers (the "Improper Tender Offers"), pursuant to which CHE's bondholders were given the "option" of tendering their Bonds for a price of 101% of par (the "Tender Price") on May 18, 2011. At the same time, Defendants issued notices of redemption (the "Improper Redemption Notices") that purported to redeem, also on May 18, 2011, all Bonds that were not tendered pursuant to the

Improper Tender Offers, at a price of 100% of par (the "Improper Redemptions"). As the Tender Price was higher than the Call Price (although still well below the value of the Bonds had they not been called on May 18, 2011), the Improper Redemption Notices were designed to coerce CHE's bondholders into tendering their Bonds to CHE, effectively forcing Bondholders to either give up their Bonds to CHE at 101%, or have them redeemed by CHE at par value.

4.     Significantly, the Improper Redemption Notices explicitly excluded tendered Bonds from redemption. Thus, Bonds tendered to CHE remain outstanding, and still draw the above-market interest rates provided for by the Indentures.

5.     The Improper Redemptions constitute a blatant violation of the Indentures. The Indentures explicitly require that any redemption of less than all of the Bonds in a single maturity -- defined in the Indentures as a "partial redemption" -- be performed "by lot," meaning by random selection, by lottery, or, at a minimum, *pro rata*. This provision is designed to protect Bondholders -- like Plaintiffs -- from a discriminatory redemption, whereby CHE selects only certain Bonds to be redeemed in a manner that improperly benefits only certain Bondholders, and harms others.

6.     Such a discriminatory redemption is exactly what occurred here. Because they were explicitly excluded from CHE's Improper Redemptions on May 18, 2011, tendered Bonds remain outstanding for all relevant purposes, and continue to draw interest at the above-market rates designated in the Indentures. Having redeemed only those Bonds held by Bondholders who refused to assent to CHE's Improper Tender Offers, and having excluded from redemption those Bonds now in CHE's possession, CHE -- with the substantial assistance of Merrill Lynch -- has conducted a non-randomized partial redemption in flagrant breach of the Indentures.

3

7.    CHE has obtained a substantial portion -- 65.7% -- of the Bonds through its Improper Tender Offers, all of which it improperly shielded from redemption. Upon information and belief, CHE, with the assistance of Merrill Lynch, now plans to use the Bonds as a short-term financing vehicle, and capture the spread between that resale price and the Tender Price for themselves, to the detriment of the non-tendering Bondholders. Indeed, Defendants have made clear in conversations with Emmet & Co. representatives, and in sworn statements made in this case, that this is exactly what they intend to do.

8.    Plaintiffs are Bondholders who, on May 18, 2011, lost their Bonds pursuant to Defendants' Improper Redemptions, and in exchange received only face value for Bonds that, only weeks earlier, had been trading well above par value. Plaintiffs have brought this action to remedy Defendants' egregious breaches under the Indentures, and to recover the value of the Bonds that were taken from them in contravention of the explicit terms of the Indentures and governing law.

## PARTIES

9.    Plaintiff Emmet & Co. is a New Jersey corporation with its principal place of business in Far Hills, New Jersey. Emmet & Co. is a bond dealer, engaged in the business of buying and selling municipal bonds. Between 50% and 60% of the buyers of bonds sold by Emmet & Co. are institutional clients. A significant quantity of the bonds bought and sold by Emmet & Co. are "defeased" municipal bonds, like the Bonds at issue here.

10.   Plaintiff FMC is a New York limited partnership with its principal place of business in New York, New York. FMC is engaged in the business of providing professional investment management services, primarily to high net worth individuals who come to FMC almost exclusively through referrals. FMC typically manages its clients' investments through

fully discretionary individual investment advisory accounts supervised by experienced portfolio managers, and provides investment services for both equity (*i.e.*, stocks) and fixed-income (*i.e.,* bonds) investments.

11.    FMC asserts claims on behalf of certain of its clients, who held a substantial quantity of the Bonds at issue here as of May 18, 2011; whose Bonds were redeemed as part of the Improper Redemptions; and who have executed Assignment Agreements assigning FMC the rights to pursue this action on their behalf (the "FMC Bondholders").

12.    Defendant CHE is a Pennsylvania not-for-profit corporation, with its principal place of business in Newton Square, Pennsylvania.  CHE is a health care system comprised of facilities that provide health care and related services in eleven states: Alabama, Connecticut, Delaware, Florida, Georgia, Maine, Massachusetts, New Jersey, New York, North Carolina and Pennsylvania.

13.    Defendant Merrill Lynch is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Merrill Lynch is a wholly-owned subsidiary of Bank of America Corporation.  Merrill Lynch served as underwriter or co-underwriter for two of the three Bond issuances at issue here and, upon information and belief, serves as financial advisor to CHE in connection with the Improper Tender Offers and Improper Redemptions.

14.    Non-party The Bank of New York Mellon Trust Company, N.A. ("BNY") is a National Association with its principal place of business in Los Angeles, California.  BNY is a subsidiary of The Bank of New York Mellon Corporation, the surviving entity of a merger between The Bank of New York Company, Inc. and Mellon Financial Corporation, the parent company of Mellon Bank, N.A. ("Mellon Bank"), which was consummated on July 1, 2007.

Upon information and belief, upon the merger, BNY succeeded to the duties of Mellon Bank as Indenture Trustee for the Bonds.

## JURISDICTION AND VENUE

15.     Defendants CHE and Merrill Lynch are each registered to do business in New York as a foreign corporation and, as such, are subject to the jurisdiction of this Court.

16.     Venue for this removed action is proper in this Court pursuant to 28 U.S.C. § 1441(a).

## FACTS

### The Bonds

17.     As detailed below, based on their reasonable expectations of the relevant characteristics of the Bonds, as expressed in the official documents disseminated by the issuers of the Bonds (including what is known as the "Official Statement" for each of the Bonds), Plaintiffs each bought a significant amount of the Bonds at issue here. The Bonds are exempt from federal taxation, have above-market interest rates, and are fully "defeased" and backed by the full faith and credit of the United States Treasury. Moreover, as detailed below, because federal arbitrage regulations diminish the incentive to call the Bonds prior to maturity, Plaintiffs reasonably believed at the time they purchased the Bonds that there was little risk of such a call occurring.

18.     As a result, as of May 18, 2011, Emmet & Co. and the clients of FMC were the beneficial holders of a total of $20.19 million in Bonds issued by three municipalities for three respective hospital systems: the "Allegheny Bonds," the "Fulco Bonds," and the "Tampa Bonds."

6

19.     The Allegheny Bonds are Series 1996 Bonds with CUSIPs 01728AMG8,

01728AMH6 and 01728AMJ2, issued by the Allegheny County Hospital Development

Authority in Allegheny County, Pennsylvania ("Allegheny") for Pittsburgh Mercy Health

Systems, Inc. ("Pittsburgh Mercy"). The Allegheny Bonds were issued in 1996 for various

corporate purposes, and are secured by Allegheny's rights under an agreement with Pittsburgh

Mercy, pursuant to which Allegheny loaned the proceeds of the Allegheny Bonds to Pittsburgh

Mercy and Pittsburgh Mercy agreed to repay such loan in amounts sufficient to pay the debt

service requirements of the Allegheny Bonds. The Allegheny Bonds were underwritten by PNC

Securities Corporation and Merrill Lynch, and are guaranteed pursuant to an insurance policy

issued by AMBAC Indemnity Corporation. The Allegheny Bonds have an interest rate of

5.625%, and are exempt from federal income taxation.

20.     The Fulco Bonds are Series 1994 Bonds with CUSIPs 359597DZ1 and

359597EA5, issued by the Fulco Hospital Authority in Fulton County, Georgia ("Fulco") for

Saint Joseph's Hospital of Atlanta, Inc. ("St. Joseph's"). The Fulco Bonds were issued in 1994

for various corporate purposes, and are secured by Fulco's rights under an agreement with St.

Joseph's, pursuant to which Fulco loaned the proceeds of the Fulco Bonds to St. Joseph's, and

St. Joseph's has agreed to repay such loan in amounts sufficient to pay the debt service

requirements of the Fulco Bonds. The Fulco Bonds were underwritten by Merrill Lynch, have

an interest rate of 5.5%, and are exempt from federal income taxation.

21.     The Tampa Bonds are Series 1993 Bonds with CUSIP 875231CN0, issued by the

City of Tampa, Florida ("Tampa") for St. Mary's Hospital Inc. ("St. Mary's"). The Tampa

Bonds were issued in 1993 for various corporate purposes, and are secured by Tampa's rights

under an agreement with St. Mary's, pursuant to which Tampa loaned the proceeds of the Tampa

Bonds to St. Mary's and St. Mary's agreed to repay such loan in amounts sufficient to pay the debt service requirements of the Tampa Bonds. St. Mary's obligations under the separate loan agreement are secured by a security interest in St. Mary's gross receipts. The Tampa Bonds were underwritten by John Nuveen & Co., and are guaranteed pursuant to an insurance policy issued by Municipal Bond Investors Assurance Corporation. The Tampa Bonds have an interest rate of 5.125%, and are exempt from federal income taxation.

22.     As of May 18, 2011, Emmet & Co. held $220,000, $225,000 and $15,000 of the Allegheny, Fulco and Tampa Bonds, respectively. As of the same date, FMC's clients held $5,065,000, $9,855,000 and $4,810,000 of the Allegheny, Fulco and Tampa Bonds, respectively. In all, as of May 18, 2011, Emmet & Co. and FMC's clients held 15.3% of all outstanding Bonds, including 44.4% of all Bonds that were ultimately redeemed pursuant to the Improper Redemption.

<b><u>The Indentures</u></b>

23.     Each of the Allegheny Bonds, the Fulco Bonds, and the Tampa Bonds are governed by a Bond Indenture. The Indentures appointed certain banking institutions as Indenture Trustee for the Bonds. As confirmed in the Improper Redemption Notices issued for the Bonds, BNY is currently the Indenture Trustee for all of the Bond issuances.

24.     The Indentures provide that the Issuer of each series of Bonds has a right to redeem the Bonds prior to maturity (the "<u>call right</u>"). The Indentures set forth detailed restrictions on the use of the call right. Among other things, the Indentures prescribe the procedures to be followed for a redemption of "less than all of the [] Bonds of a single maturity" -- *i.e.*, a "partial redemption." (Allegheny Indenture, § 3.4; Fulco Indenture, § 304; Tampa Indenture, § 3.05.) Thus as provided in the Indentures governing all three issuances, in the event

8

of a partial redemption, the Trustee must select the Bonds to be redeemed "by lot" -- in other words, through a randomized selection process. (*Id.*)

25.     Subsequent to the execution of the Indentures, on February 19, 1998, CHE entered into certain escrow agreements with the issuers of the Bonds (the "Escrow Agreements"). Pursuant to the Escrow Agreements, CHE deposited Treasury securities into escrow accounts sufficient to fully "defease" the Bonds through maturity -- that is, to pay all of the required cash flows of the Bonds (comprised of interest and principal). In these agreements, CHE also retained the call right, described in the Escrow Agreements as the right to redeem all or some of the Bonds prior to maturity, on any date "permitted under the [Indentures]." (*See, e.g.*, Fulco Escrow Agreement, § 1.) Crucially, the call right retained by CHE under the Escrow Agreements remained subject to the requirements in the Indentures -- including the requirement that partial redemptions be performed "by lot."

### The Bonds Rise In Value

26.     Since issuance of the Bonds in 1993, 1994 and 1996, interest rates have fallen dramatically -- such that the interest rate on a similar quality, tax-exempt bond with a maturity that parallels that of the Bonds is today only around 3% to 4%. As noted above, the Bonds have an interest rate of between 5.125% and 5.625%. As a result, the market value of the Bonds rose significantly, and bonds with similar qualities, interest rates, and terms as the Bonds have traded recently for as high as 114.75% of face value. Indeed, up until the eve of CHE's March 29, 2011 announcement (as described below), the Bonds traded well above par value -- including for as high as 108% in the two months preceding the announcement.

27.     Although pursuant to the call right the Bonds were redeemable prior to their maturity, and although the Bonds rose in value, CHE had little real incentive to redeem them (at

least, without engaging in a breach of contract). As the Bonds were defeased, the only profit that

CHE could realize by calling all the Bonds would be through the sale of the Treasury securities

held in the escrow account, which, because interest rates have fallen since the Bonds were

defeased in 1998, are significantly more valuable now than when they were purchased.

However, the federal government generally treats a significant portion of such profits as

prohibited "tax arbitrage" -- *i.e.*, profits that arise when a municipal issuer takes advantage of its

tax-exempt status by using proceeds from the issuance of tax-exempt securities to purchase

taxable securities with higher interest rates. Thus, if CHE simply called all the Bonds and

liquidated the defeasance escrow, CHE would be forced to remit a significant portion of the

resulting profits to the federal government.

### CHE Extends The Improper Tender Offers And Issues The Improper Redemption Notices, And Purports To Redeem The Bonds In Contravention Of The Terms Of The Indentures

28.    On March 29, 2011, CHE sent holders of the Bonds letters (the "Tender Offer

Letters") announcing the Improper Tender Offers, pursuant to which CHE offered to purchase

Bonds tendered to it by the close of business on April 26, 2011, at a price of 101% of par value.

CHE stated it would pay for the tendered Bonds on May 18, 2011.

29.    In the Tender Offer Letters, CHE also announced that it had directed BNY to

issue the Improper Redemption Notices. Enclosed with the Tender Offer Letters, CHE included

a document containing "Questions and Answers" (the "Tender Offer Q&A"), and also enclosed

the Improper Redemption Notices issued by BNY. In the Improper Redemption Notices, BNY

stated that "[a]ll holders of the Bonds shall have the option to either tender their Bonds to

Catholic Health East pursuant to such Tender Offer at a purchase price of 101%, or to not tender

their Bonds in which case their Bonds will be redeemed on the Redemption Date at a redemption

price of 100%." (*See, e.g.*, Allegheny Improper Redemption Notice, p.2.)  The Tender Offer

Letters made clear that "*the call for redemption is irrevocable,*" and that "*[a]ll un-tendered*

*Bonds will be redeemed at par . . . through a liquidation of [] existing escrow funds.*" (*See, e.g.*,

Allegheny Tender Offer Letter, p.1 (emphasis in original).)  The Redemption Date for the

Improper Redemptions and the payment date for the Improper Tender Offers were set for the

same day, May 18, 2011.

        30.     The documents distributed by CHE and BNY make clear that there was no

alternative to the proposed Improper Tender Offers (at 101%) or Improper Redemptions (at

100%).  The Improper Tender Offers and Improper Redemption Notices were plainly designed to

induce CHE's bondholders to tender their Bonds at a purchase price of 101% of par -- well

below the actual value of the Bonds on the Redemption Date.  As the Tender Offer Letters state,

"[r]edemption at the lower price is automatic.  If you do not tender your Bonds by April 26,

2011, your Bonds will be automatically redeemed at a price of 100% on May 18, 2011.  Your

Bonds will cease to accrue interest on that date." (*See, e.g.*, Allegheny Tender Offer Letter, p.2.)

        31.     As set forth in the Improper Redemption Notices, however, CHE would *not*

redeem or otherwise take out of circulation tendered Bonds.  Instead, "any Bonds tendered to

Catholic Health East for purchase . . . pursuant to the Tender Offer[s] shall not be subject to

redemption at par on the Redemption Date, shall be excluded from such redemption, shall be

purchased by Catholic Health East at a purchase price of 101%, *and shall remain outstanding*

. . ." (*See, e.g.*, Allegheny Improper Redemption Notice, pp. 2-3 (emphasis added).)

## CHE Consummates The Improper Redemptions

        32.     On April 27, 2011, CHE issued Notices of Extension for the Bonds, stating that

"[f]or the benefit of late-tendering bondholders, the Tender Offer has been extended . . . through

. . . May 3, 2011." (*See, e.g.*, Allegheny Notice of Extension, p.1.)  The Notices of Extension made clear that, "[d]ue to favorable market conditions, ALL bonds not tendered will be called for redemption on May 18, 2011, the Settlement Date, and ALL tendered Bonds will be purchased and paid for on May 18, 2011, the Settlement date." (*Id.* (boldface omitted, capitalization in original).)

33.     On May 4, 2011, CHE distributed "Acceptance Notices" for each of the three types of Bonds.  The Acceptance Notices state that "CHE has accepted for purchase all of the Bonds validly tendered as of the Deadline Date [April 26, 2011] and Extension Deadline Date [May 3, 2011] at the Tender Price of 101%." (*See, e.g.*, Allegheny Acceptance Notice, p.1.) According to the Acceptance Notices, CHE accepted for tender 65.7% of the outstanding par amount of the Bonds.  Pursuant to the Acceptance Notices, the Settlement Date for the Improper Tender Offers and the Improper Redemptions remained May 18, 2011.

34.     On May 13, 2011, Emmet & Co. commenced this action in the Commercial Division of the New York Supreme Court for the County of New York, seeking temporary and permanent injunctive relief preventing the consummation of the Improper Redemptions and Improper Tender Offers.  On May 16, 2011, CHE removed the action to this Court.  On May 18, 2011, this Court denied Emmet & Co.'s motion for a temporary restraining order and preliminary injunction enjoining the transaction.  The same day, CHE, with the assistance of BNY and Merrill Lynch, consummated the Improper Redemptions and Improper Tender Offers.  The Bonds held by Plaintiffs were redeemed for par value, and CHE took possession of Bonds surrendered by tendering Bondholders -- all of which were excluded from redemption and, upon information and belief, remain outstanding to this day -- for a paltry 101 cents on the dollar.

## The Transaction Violates The Indentures

35.     In the Tender Offer Letters, CHE stated that it had "directed [BNY] to call all of the Bonds for redemption at 100% on May 18, 2011, **except** for those Bonds tendered to [CHE] and purchased during our [T]ender [O]ffer . . ." (*See, e.g.,* Allegheny Tender Offer Letter, p.1 (emphasis in original).) Thus, all Bonds surrendered to CHE through CHE's coercive tender offer were excluded from the Improper Redemptions, whereas the Bonds of all Bondholders that refused to tender to CHE were automatically redeemed. This procedure, which discriminates against non-tendering Bondholders in favor of CHE, is a brazen violation of the terms of the Indentures.

36.     The Indentures prescribe the procedures to be followed for a redemption of "less than all of the [] Bonds of a single maturity" -- *i.e.,* a "partial redemption." (Fulco Indenture, § 3.4; Allegheny Indenture, § 304; Tampa Indenture, § 3.05.) The Improper Redemptions, as contemplated by the Improper Redemption Notices and as implemented on May 18, 2011, redeemed only "the Bonds that are not tendered for purchase pursuant to [CHE's] Tender Offer[s]." (*See, e.g.,* Allegheny Tender Offer Letter, p.1.) As CHE's pre-redemption notices made clear, "any Bonds tendered to [CHE] . . . shall not be subject to redemption . . . and shall remain outstanding . . ." (*See, e.g.,* Allegheny Improper Redemption Notice, pp. 2-3.) Because Bonds tendered to CHE remain outstanding, they are still subject to redemption -- and because the Improper Redemptions did not include these Bonds, the Improper Redemptions were clearly redemptions of "less than all of the [] Bonds of a single maturity," and therefore constituted "partial redemptions." (*Id.*)

37.     Although clearly constituting "partial redemptions," the Improper Redemptions failed to satisfy the procedural requirements applicable to a partial redemption under the

13

Indentures, as the Indentures require that any partial redemption be performed "by lot." (Fulco Indenture, § 3.4; Allegheny Indenture, § 304; Tampa Indenture, § 3.05.)

38.    The "by lot" requirement is also contained in the "Official Statements" released to potential investors in conjunction with the Bonds -- which contain a description of the Bonds, the governing documents, and the risk factors associated with investing in the Bonds:

> If less than all of the [] Bonds of a single maturity are to be redeemed, any [] Bond of such maturity in a denomination greater than $5,000 may be called for partial redemption in the principal amount of $5,000 or any integral multiple thereof, and for the purpose of determining the [] Bonds to be redeemed, the Trustee will treat the entire principal amount of the [] Bonds of such maturity as if the same were a separate [] Bond of $5,000 each and will assign separate numbers to each for the purpose of determining the particular [] Bonds to be redeemed *by lot.*

(Allegheny Official Statement, pp. 5-6 (emphasis added); *see also* Fulco Official Statement, p.5 (same); Tampa Official Statement, p.13 (same).)  And the Official Statements further note that The Depository Trust Company ("DTC"), which is charged with holding the "Book-Entry" form of the Bonds, will make any partial redemption "by lot":

> If less than all of the [] Bonds of a particular maturity are being redeemed, DTC's practice is to determine *by lot* the amount of the interest of each Direct Participant in such Bonds to be redeemed.

(Allegheny Official Statement, p.8 (emphasis added); *see also* Fulco Official Statement, p.10 (same); Tampa Official Statement, p.13 (same).)

39.    As a result, any partial redemption -- such as the Improper Redemptions -- must be conducted "by lot."  This phrase has an unambiguous and well-known meaning, understood by the parties as well as the bond-trading public at large:  a partial redemption conducted "by lot" must be truly random, such that any outstanding Bond may be subject to redemption if its "lot" number is drawn by the Trustee. Each Bond issued pursuant to the Indentures therefore

contains a bargained-for right to the chance that it will not be included in a partial redemption if

its "lot" is not called by the Trustee. By directing ahead of time which Bonds were to be

redeemed, and which Bonds were exempt from redemption, the Improper Redemptions interfere

with this right. As such, the Improper Redemptions are a breach of the Indentures.

     40.     Recognizing that the Improper Redemptions and Improper Tender Offers violated

the Bondholders' rights under the Indentures, CHE attempted to legitimize its breach by

requiring tendering Bondholders to waive certain rights in the Indentures upon tendering the

Bonds. According to the Improper Redemption Notices and Tender Offer Letters,

> [a]ll holders that elect to tender their Bonds pursuant to such Tender Offer
> in order to receive a purchase price of 101% shall agree, acknowledge,
> consent to, and waive any and all inconsistent provisions of the Prior
> Bonds Instrument related to, and by tendering their Bonds shall be deemed
> to have agreed, acknowledged, consented to, and waived any and all
> inconsistent provisions of the Prior Bonds Instrument related to, the
> implementation of the terms of such Tender Offer by which any and all of
> the Bonds that are tendered to Catholic Health East for purchase pursuant
> to the Tender Offer will be excluded from the redemption of the Bonds at
> par on the Redemption Date. As such, any Bonds tendered to Catholic
> Health East for purchase at a purchase price of 101% of their principal
> amount pursuant to the Tender Offer shall not be subject to redemption at
> par on the Redemption Date, shall be excluded from such redemption,
> shall be purchased by Catholic Health East at a purchase price of 101%,
> and shall remain outstanding under the Prior Bonds Instrument and shall
> continue to be defeased pursuant to, and secured solely by, the Escrow
> Agreement.

(*See, e.g.*, Allegheny Improper Redemption Notice, pp. 2-3.)

     41.     By virtue of these waivers, CHE purports to exclude the tendered (but still

outstanding) Bonds from the requirement that partial redemptions be performed "by lot." But a

waiver of rights by less than all Bondholders, such as the one obtained by CHE here, is simply

insufficient to exempt any Bonds -- whether tendered or not -- from the requirement that partial

redemptions be performed on a randomized basis, *i.e.*, by lot. This requirement was put in place

to protect *all* Bondholders (including Plaintiffs) from self-dealing redemptions that, like the Improper Redemptions, seek to benefit only one class of Bondholders to the detriment of other Bondholders, by specially selecting only the latter Bondholders' Bonds for redemption.

42.     Until *all* Bondholders have freely waived their right to a partial redemption performed "by lot," CHE must abide by the plain terms of the Indentures that unequivocally provide for the right to such a procedure. Thus, since CHE has neither solicited nor received a waiver of rights from Plaintiffs -- or any other non-tendering Bondholders -- CHE may not pursue a partial redemption in any manner other than "by lot." Because the Improper Redemptions did just that, the Improper Redemptions directly violated the Indentures, and CHE is in breach of contract.

### The Improper Redemptions Unjustly Enriched
### CHE And Merrill Lynch At The Expense Of CHE's Bondholders

43.     As noted above, the impact of the federal arbitrage rules has generally been to limit the profits CHE could obtain through the exercise of its call right. The Improper Redemptions are nothing more than CHE's attempt to improperly reap the premium at which the Bonds were trading in the Spring of 2011, while minimizing or even eliminating its obligation to forfeit any profits to the Treasury. By using the coercive threat of the Improper Redemption Notices to force Bondholders to tender to CHE their Bonds, CHE took possession of Bonds that were worth between 105% and 115% of par, for a paltry 1% premium over face value. Because Defendants, in breach of the Indenture, structured the Improper Redemptions such that Bonds tendered to CHE have not been redeemed, CHE will be free to sell the tendered Bonds to third parties for the market rates of between 105% and 115% of par, or use the Bonds as a short-term

financing vehicle -- thereby capturing the spread between the Bonds' above-market price and the Tender Price of 101%.

44.    Indeed, the documents CHE distributed to its Bondholders in connection with the transaction make clear that CHE intends to utilize the tendered Bonds to generate revenue (and, on information and belief, generate substantial fees and/or revenues for Merrill Lynch). Thus, the Tender Offer Letters state that

> CHE can save more money by repurchasing your Bonds via this tender offer than we can by calling them for redemption. By tendering for these bonds, we can work with our advisors to restructure our financing related to the tendered Bonds in a manner that saves money for CHE.

(*See, e.g.*, Allegheny Tender Offer Letter, p.1.) And the Tender Offer Q&A states that

> [w]e [CHE] believe Catholic Health East can achieve more savings and flexibility by repurchasing your Bonds than by calling them. By tendering for these bonds, we can work with our advisors to restructure our financing related to the Bonds in a manner that saves money for the System.

(*See, e.g.*, Allegheny Tender Offer Q&A, p.3, Question 8.)

45.    Moreover, CHE's "advisors" -- *i.e.*, CHE's investment bankers at Merrill Lynch -- have confirmed to Plaintiffs that utilizing the tendered Bonds is exactly what the Defendants have in mind. On or about April 13, 2011, Lawrence Newman, an Emmet & Co. executive, placed a call to Randal M. Schultz, CHE's Vice President for Capital Strategy & Management, regarding questions Emmet & Co. had concerning the Improper Tender Offers and Improper Redemptions. Mr. Newman's call was returned not by a CHE representative, but instead by Jeffrey Newhams, a Managing Director at Merrill Lynch, who stated that, if they could "entice" Bondholders to tender their Bonds at a price of 101%, those tendered Bonds would not then be redeemed. Instead, according to Mr. Newhams, there was a "good chance" that the tendered

Bonds would be sold, presumably at a substantial mark-up from the tender price, to a third party that Mr. Newhams refused to name.

46.     CHE's intention to use the Bonds it obtained through its coercive transaction to seek additional profits is also evident from CHE's submissions in this very case, in which Mr. Schultz for CHE admits that CHE "has entered into an agreement to sell the tendered bonds to Merrill Lynch at par as part of a 'total return swap' transaction." In a total return swap transaction, a party generally agrees to make a payment equal to the "return" on a capital asset, such as the Bonds, in exchange for a floating coupon payment, providing the party that owns the capital asset with access to revenues that might otherwise be prohibited. Thus, although the exact nature of the transaction undertaken by CHE and Merrill Lynch is unknown, the transaction will, on information and belief, enable CHE to obtain profits from the Bonds while avoiding federal arbitrage rules. The transaction will also, at the same time, provide Merrill Lynch with substantial fees and/or revenues.

## Merrill Lynch Induced CHE's Breach Of Contract

47.     As CHE's investment advisor, Merrill Lynch has played a critical role in inducing and assisting CHE in breaching its obligations under the Indentures. As CHE's advisor, and as underwriter for the Fulco Bonds and Allegheny Bonds, Merrill Lynch was clearly aware of the Indentures and the terms contained therein. Nevertheless, on information and belief, in pursuit of underwriting and other fees, Merrill Lynch assisted CHE with every facet of its improper transactions.

48.     Among other things, Merrill Lynch has, upon information and belief, developed and executed a plan to extract profits from Bonds that were tendered to CHE. Indeed, CHE

admits that Merrill Lynch is the counterparty for the "total return swap" transaction through which CHE intends to reap its illicit profits.

49.      Merrill Lynch's involvement in the Improper Redemptions and Improper Tender Offers is also evidenced by the fact that it served as the primary point of contact for Bondholders wishing to discuss the transaction.  As noted above, when Emmet & Co. called Mr. Schultz of CHE with questions concerning the transaction, it was Mr. Newhams of Merrill Lynch that returned his call.

## Plaintiffs Were Injured By Defendants' Bad-Faith Conduct

50.      As noted above, the market value of the Plaintiffs' Bonds was as high as 104% to 108% of par on the eve of CHE's announcement of the Improper Tender Offer and Improper Redemption Notices.  These high values reflected the fact that the Bonds bore above-market interest rates for bonds with similar risk profiles, and thus the present value of the future cash flows reasonably expected from the Bonds, using a market discount rate, was well above 100%.

51.      Through Defendants' improper conduct, Plaintiffs have been deprived of all of these expected cash flows.  In exchange for their Bonds, which were either improperly redeemed or purchased through a coercive tender offer, Plaintiffs received only 100 cents on the dollar. Plaintiffs cannot use these funds to purchase comparable bonds (in terms of quality and yield), because such bonds are not available on the market today; the Bonds were truly unique investment securities.  Because Defendants' bad-faith conduct has deprived Plaintiffs of their Bonds, Plaintiffs have suffered substantial injuries.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Against CHE for Breach of Contract)

52.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 51 herein.

53.    The Indentures are valid contracts, of which Plaintiffs, as Bondholders, are express beneficiaries.

54.    The Indentures set forth the requirements by which any redemption of "less than all of the [] Bonds of a single maturity" -- known as a "partial redemption" -- is to be performed. Specifically, the Indentures require that any such partial redemption be performed "by lot."

55.    The term "by lot" was and is understood by buyers, sellers and holders of Bonds to mean a truly random selection of Bonds for redemption or, at a minimum, a selection of Bonds *pro rata*. The Indentures therefore require that any redemption of less than all outstanding Bonds be performed in a manner that treats all Bonds equitably, such that each Bond has an equal chance of being redeemed.

56.    On March 29, 2011, CHE caused to be issued the Improper Redemption Notices, and issued the Improper Tender Offer Letters.  On May 18, 2011, CHE caused the Improper Redemptions and Improper Tender Offers to be consummated.

57.    The Improper Redemptions redeemed only those Bonds that were not tendered to CHE, thus entirely excluding from the Improper Redemptions all outstanding Bonds that CHE will possess as a result of the Improper Tender Offers, and allowing CHE (along with its advisors at Merrill Lynch) to reap all the benefits of the above-market price of the Bonds.

58.    Because the Improper Redemptions redeemed only a portion of the outstanding Bonds -- *i.e.*, the portion in the possession of Plaintiffs and other non-tendering Bondholders --

the Improper Redemptions are clearly "partial redemptions" under the governing Indentures, and must be performed in the manner set forth therein.

59.    Because they exempted from the partial redemption those Bonds held by CHE as a result of the Improper Tender Offers, the Improper Redemptions violated the provisions of the Indentures governing partial redemptions.

60.    By reason of the foregoing, CHE has breached the Indentures. CHE's breach has directly harmed Plaintiffs, as CHE's improper actions -- including its direction that BNY issue, and BNY's issuance of, the Improper Redemption Notices; CHE's issuance of the Improper Tender Offers; and its actions in furtherance of the consummation of the Improper Redemptions and Improper Tender Offers -- have directly resulted in Plaintiffs' forfeiture of their Bonds, for prices that are significantly below the market of their Bonds. Plaintiffs have been deprived, and will continue to be deprived, of the interest payments required by the Indentures for each of their Bonds, which payments were at interest rates substantially higher than rates available on comparable investments.

61.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, including interest, costs and attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Against CHE for Breach of the Implied Contract of Good Faith and Fair Dealing)

62.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 herein.

63.    The Indentures are valid contracts, of which Plaintiffs, as Bondholders, are express beneficiaries.

64.     Implicit in every contract, including the Indentures, is an implied covenant of good faith and fair dealing.

65.     CHE breached this implied covenant through its conspiratorial, bad faith and predatory conduct, as described above, in issuing the Improper Tender Offers and Improper Redemption Notices to coerce CHE's Bondholders to tender to CHE their Bonds for a below-market price, and taking actions to consummate the Improper Redemptions and thereby deprive Plaintiffs of the benefits to which they are entitled under the Indentures.

66.     As a result of CHE's bad faith and predatory conduct, Plaintiffs have been damaged in an amount to be determined at trial, including interest, costs and attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Against Merrill Lynch for Tortious Interference with Contract)

67.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 66 herein.

68.     Merrill Lynch was aware of the existence and terms of the Indentures, which are valid and binding contracts, at all relevant times herein, because, among other things, Merrill Lynch was the sole underwriter for the Fulco Bonds, and a co-underwriter for the Allegheny Bonds.

69.     Upon information and belief, through its actions as CHE's investment advisor, Merrill Lynch influenced, induced and coerced CHE into commencing and consummating the Improper Redemptions and Improper Tender Offers, in order to obtain the above-market-value price of the Bonds for CHE, and fees and/or revenues for itself.  Among other things, Merrill Lynch has served as the primary point of contact for Bondholders with inquiries regarding the Improper Redemptions and Improper Tender Offers, and, on information and belief, worked to

22

structure the "total return swap" transaction with CHE that allowed CHE to profit from tendered Bonds.

70.     Aside from serving as CHE's investment advisor, Merrill Lynch has no valid economic interest in CHE with respect to the Bonds, or with respect to CHE's contractual relationship with CHE's Bondholders.

71.     CHE's actions in pursuing the Improper Redemptions and Improper Tender Offers, with Merrill Lynch's assistance and inducement, breached the Indentures governing the Bonds.

72.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, including interest, costs and attorneys' fees.

73.     Based upon Merrill Lynch's egregious behavior, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment should be entered in favor of Plaintiffs as follows:

(a)     On all causes of action, damages in an amount to be determined at trial; and

(b)     On Plaintiffs' second and third causes of action, punitive damages in an amount to be determined at trial; and

(c)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      July 27, 2011

                    Respectfully submitted,

                    KASOWITZ, BENSON, TORRES
                    & FRIEDMAN LLP

                    By: _____
                        Aaron H. Marks
                        Gavin D. Schryver
                        A. Macdonald Caputo, Jr.

                    1633 Broadway
                    New York, New York 10019
                    Tel:    (212) 506-1700
                    Fax:   (212) 506-1800
                    Email: amarks@kasowitz.com
                          gschryver@kasowitz.com
                          acaputo@kasowitz.com

                    *Attorneys for Plaintiffs*